**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOBETH KISSINGER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE MENNONITE HOME,** | : | |
| **d/b/a MENNONITE HOME** | : | **No. 20-3000** |
| **COMMUNITIES, et al.,** | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                        **November 17, 2021**

Plaintiff JoBeth Kissinger brings this action against Defendants Mennonite Home Communities ("Mennonite Home"), Kimberly Blessing, and Dan Mortensen under the Family and Medical Leave Act ("FMLA"), Americans with Disabilities Act ("ADA"), and Pennsylvania Human Relations Act ("PHRA"). Kissinger, who suffers from chronic anxiety and depression, contends that Defendants violated her rights when they denied her request for FMLA leave and subsequently terminated her from her position as Mennonite Home's Director of Dining Services. Kissinger asserts ten claims: five FMLA retaliation claims, one FMLA interference claim, one ADA retaliation claim, one ADA discrimination claim, one PHRA retaliation claim, and one PHRA discrimination claim. The Court conducted a bench trial from August 3, 2021 through August 5, 2021. For the reasons stated below, the Court finds in favor of Kissinger on her FMLA interference, ADA discrimination, and PHRA discrimination claims.

1

## I.     FINDINGS OF FACT

### A.     The Mennonite Home "Family"

Mennonite Home is a 501(c)(3) non-profit organization that provides personal, residential, and nursing home care to its residents. (Joint Pretrial Stip. Agreed Facts [Agreed Facts] ¶¶ 1-2.) Plaintiff Kissinger was hired by Mennonite Home as a Dining Services Supervisor in 2000. (*Id.* ¶ 8.) She obtained her high school diploma in 1991, after which she worked as a prep cook and server at Franklin and Marshall College and a Mr. Steak restaurant. (*Id.* ¶ 5; Aug. 3, 2021 Trial Tr. at 17.) Kissinger then worked at Willow Valley Lakes Community Retirement Center as a cook before being hired by Mennonite Home. (Aug. 3, 2021 Trial Tr. at 17.) Kissinger also obtained a Dietary Manager Certificate from Harrisburg Area Community College in 2007. (Agreed Facts ¶¶ 6-7.) Kissinger was promoted several times throughout her career at Mennonite Home. In 2010, Kissinger was promoted to her most recent position, Director of Dining Services. (*Id.* ¶ 9.) Director of Dining Services is an exempt position with an annual base salary of $84,422. (*Id.* ¶¶ 10, 36.)

Kissinger supervised approximately sixty-five to seventy-five other Mennonite Home employees as Director of Dining Services. (Aug. 3, 2021 Trial Tr. at 213-14.) Her supervisees included Dining Services Supervisor Priya Daye, Dietician Clara Iuliano, and Utility Aide Anthony Kham. (*Id.* at 134-35; Aug 4, 2021 Trial Tr. at 6-7, 106-07.) Kissinger also worked alongside Terri Mason, a staff trainer who provided coaching to Mennonite Home employees. (Aug. 3, 2021 Trial Tr. at 192.)

Kissinger was supervised by John Sauder in 2010, and again from approximately May 2015 through December 2016, at which time he became Mennonite Home's President. (*Id.* at 24, 30, 151, 166.) Prior to becoming President, Sauder held several roles at Mennonite Home, including director of its human resources ("HR") department. (*Id.* at 166-67.)

Defendant Blessing became Kissinger's supervisor in January 2017. (*Id.* at 155.) Blessing first started working for Mennonite Home in May 2011, and she was promoted to Vice President of HR and Organizational Development and Training in May 2016. (Agreed Facts ¶¶ 11-12; Aug. 4, 2021 Trial Tr. at 37.) She had at least sixteen years of HR experience at the time of her 2016 promotion and, as such, has received extensive training on both the FMLA and the ADA throughout her career. (Aug. 4, 2021 Trial Tr. at 39.) Blessing supervised Kissinger through June 27, 2017, at which time Defendant Mortensen started at Mennonite Home as Vice President of Operations and became Kissinger's supervisor. (Agreed Facts ¶ 17; Aug. 3, 2021 Trial Tr. at 155.)

Kissinger's coworkers viewed her as a solid, reliable employee. She received commendable performance reviews from her superiors. (Aug. 3, 2021 Trial Tr. at 29-30; *see also* Joint Ex. 4. *See generally* Pl.'s Ex. 5.) Until the summer of 2017, Kissinger never had any performance issues, received any coaching, or had any indication that any of her coworkers, including Blessing and Mortensen, were dissatisfied with her performance at work. (Aug. 3, 2021 Trial Tr. at 31, 50-51; *see also id.* at 139, 155.)

### B.      Mennonite Home's Absence and Leave Policies

Policy 211 of Mennonite Home's Employee Handbook (the "Handbook") governs "Absenteeism/Call-Ins." (Joint Ex. 5 at Kissinger000567.) It states that "[u]nscheduled absences should be called-in to your Supervisor as far ahead as possible, prior to the shift beginning. DO NOT LEAVE A MESSAGE on voice mail. If you do not call in prior to the beginning of your shift, you will be considered a no call/no show." (*Id.*) "No call/no show" is defined as "not calling or showing for a scheduled shift." (*Id.*) The policy further states that "[t]wo consecutive or separate no call/no shows in [a] 12-month period will warrant immediate termination." (*Id.*)

Several witnesses testified to the flexibility provided by each department's leadership regarding attendance; rarely is the Handbook followed to a tee. For example, Mason noted that "in a nursing home, they work twenty-four seven. So there might be times that, you know, I would come in late or come in early, stay late." (Aug. 3, 2021 Trial Tr. at 201.) Mason specifically highlighted that Blessing administers Mennonite Home's attendance policy "liberal[ly]." (*Id.* at 207.) Sauder testified that he does not micromanage directors and "expect[s] [them] to put in whatever [is] needed to get the job done[.]" (*Id.* at 155.)

Mennonite Home employees can take several types of leave, including personal leaves of absence and FMLA leave. According to the Handbook, FMLA leave is appropriate if a Mennonite Home employee has a "serious health condition." (Joint Ex. 5 at Kissinger000557.) The Handbook states that employees may take FMLA leave for "up to twelve (12) workweeks in a rolling 12-month period" or "may take their allotment of FMLA leave intermittently or in accordance with a reduced schedule, if this is medically necessary." (*Id.* at Kissinger000558.)

Questions related to FMLA leave, including whether employees qualify for it, are directed to Mennonite Home's HR department; department heads and directors do not determine whether FMLA leave is warranted in a given situation. (*See, e.g.*, Aug. 3, 2021 Trial Tr. at 48-49, 155-56; Aug. 4, 2021 Trial Tr. at 76.) Kissinger, for example, testified that as Director of Dining Services, she sent her supervisees to HR to determine whether they were entitled to leave. (Aug. 3, 2021 Trial Tr. at 221.) Mortensen testified that he relies on Blessing and HR to guide him in conversations related to FMLA leave and the ADA. (Aug. 4, 2021 Trial Tr. at 209.) Sauder testified that he "count[s] on my HR department and Kimberly Blessing [as Vice President] of HR to [] administer FMLA" and that he "would have referred [Kissinger] to Kimberly Blessing as the [Vice

President] of HR" if she had asked him for FMLA leave or an accommodation. (Aug. 3, 2021 Trial Tr. at 156, 169.)

After HR is informed of an employee's request for FMLA leave, a representative from the department assesses whether the employee qualifies. (Aug. 4, 2021 Trial Tr. at 47, 51.) The representative guides the employee through the application process and provides the necessary paperwork to take to a doctor to certify that FMLA leave would be appropriate. (*Id.*) If HR ultimately does not believe that an employee qualifies for FMLA leave, the representative would discuss the reasoning behind that decision with the employee. (*Id.* at 52.)

According to Blessing, the following scenarios would trigger an assessment for FMLA leave: an employee telling HR that they were stressed and that they were unable to come into work because they were stressed; an employee telling HR that they had depression and anxiety and needed treatment; an employee in need of Employee Assistance Program[1] ("EAP") services being absent from work for three days or longer; or an employee returning to work following a leave of absence in need of or seeking EAP services. (*Id.* at 46-47, 49-51.)

### C.   Kissinger's Health Conditions

Kissinger suffers from chronic anxiety and depression. (*See* Joint Exs. 1 and 28.) Kissinger testified extensively about the effects her conditions have had on her life, including how they have caused panic attacks, breakdowns, concentration issues, weight loss, appetite loss, and insomnia. (*See, e.g.*, Aug. 3, 2021 Trial Tr. at 25-27, 32, 37-38, 40-45, 53.) For example, Kissinger frequently broke down crying at work, increasingly so toward the end of 2016 and through 2017. (*Id.* at 25, 27, 32, 40-45.) Between late 2016 and the summer of 2017, Kissinger's weight fell from

---

[1] Mennonite Home offers counseling to employees through its EAP services, including therapy in connection with mental health issues. Employees' first three EAP sessions are free of charge to them. (Aug. 3, 2021 Trial Tr. at 54.)

approximately 140 pounds to 109 pounds. (*Id.* at 38, 41, 78.) According to Kissinger, although "some days [] are better than others," her anxiety and depression are "always there." (*Id.* at 25.)

Kissinger has been treated for anxiety and depression since at least the age of fifteen, when she was first prescribed antidepressant medication. (Aug. 3, 2021 Trial Tr. at 15-16.) Her current physician, Dr. Garry Mueller, has treated Kissinger for her anxiety and depression since she was eighteen. (*Id.* at 26.) Dr. Mueller has observed Kissinger's numerous symptoms over the course of his long history as her physician, including her concentration issues, weight loss, excessive crying, insomnia, fatigue, and the jerking of her legs. (Aug. 4, 2021 Trial Tr. at 132-33, 138-41, 147-150, 161-62. *See generally* Joint Exs. 1 and 28.) He has changed her medication several times in recent years. (*See, e.g.*, Aug. 3, 2021 Trial Tr. at 26; Aug. 4, 2021 Trial Tr. at 121-22, 124-25, 131-32, 150-53, 159-61, 170. *See generally* Joint Ex. 1.) Beginning in at least the summer of 2017, Kissinger also saw a therapist through Mennonite Home's EAP services. (Aug. 3, 2021 Trial Tr. at 55-56; Aug. 4, 2021 Trial Tr. at 79.)

Kissinger has shared her experiences as a person living with anxiety and depression with her Mennonite Home coworkers, who also observed symptoms of her conditions while at work. For example, Mason and Kissinger discussed their shared experiences with depression on multiple occasions, and Kissinger told Mason that she had been formally diagnosed with anxiety and depression and was being treated with medication for those conditions. (Aug. 3, 2021 Trial Tr. at 46-48, 195, 203-04.) Mason observed that "it was apparent to anybody that saw her, she was going through depression" because "she had lost a lot of weight, you would see her with her eyes red all the time or nose running." (*Id.* at 196.) Mason also believed that it was common knowledge "that she had bad anxiety and depression" and "certainly anybody who supervised her, worked in her department, or worked closely with her would've known that." (*Id.* at 203.)

On multiple occasions in early 2017, Iuliano observed Kissinger crying in meetings, which Kissinger would attribute to "changing meds." (*Id.* at 134-35, 137.) Kissinger told Iuliano about the medication she was taking and Iuliano recognized Kissinger's medication as treating depression. (*Id.* at 147.) When Iuliano expressed concern to Kissinger about her weight loss, Kissinger told her that she suffered from anxiety and depression. (*Id.* at 45, 136.) Iuliano offered Kissinger contact information for a friend who ran a treatment center for persons with anxiety and depression. (*Id.* at 45.) Iuliano discussed Kissinger's state with another coworker in spring 2017, observing that Kissinger appeared to weigh less every time Iuliano saw her, experienced nose bleeds, and cried a lot, noting that "anybody meeting with her would've noticed that." (*Id.* at 137-38.) Iuliano also saw Kissinger crying at the Mennonite Home copying machine shortly before she went on leave. (*Id.* at 147.)

Daye observed Kissinger crying several times between 2014 and 2017, including in Daye's office, Kissinger's office, and in the hallway. (Aug. 4, 2021 Trial Tr. at 7.) In 2017, Kissinger had a panic attack in Daye's office, crying and hyperventilating after feeling overwhelmed by her workload. (Aug. 3, 2021 Trial Tr. at 42-43.)

Kham observed Kissinger lose "a significant amount of weight" between 2016 and 2017. (Aug. 4, 2021 Trial Tr. at 107.) He noticed her previously well-organized office become messy and cluttered after 2016. (*Id.* at 109.) He also saw her crying into Daye's shoulder in 2017. (*Id.* at 108.)

Kissinger additionally shared her experiences with anxiety and depression with Sauder and Blessing. Kissinger first disclosed her depression to her then-supervisor Sauder in 2010. (Aug. 3, 2021 Trial Tr. at 24-25, 31.) In 2015, Kissinger told Sauder that her anxiety and depression were flaring up in light of her son Mason Kissinger's ADHD diagnosis, behavioral issues, problems in

school, and placement on juvenile probation. (*Id.* at 31-32.) In response, Sauder offered Kissinger advice regarding her son and said that he would pray for Kissinger and her family. (*Id.* at 32.) In 2016, Sauder saw Kissinger crying and hyperventilating in her office, and Kissinger told him that she was having a panic attack. (*Id.* at 43-44.) Also in 2016, Sauder gave Kissinger a birthday card that praised her handling of the ongoing renovations of Mennonite Home's dining rooms and acknowledged the hardships she faced at the time, writing that he "hop[ed] that in the midst of all you have going on, you can find some time to do something you enjoy to celebrate your birthday. I appreciate your commitment and ability to persevere when things are not necessarily easy, and you have rose to the occasion again with the dining room project." (*Id.* at 36; Joint Ex. 4 at Kissinger000514.)

Kissinger first told Blessing about her anxiety and depression in 2010, during training for her new Director of Dining Services position. (Aug. 3, 2021 Trial Tr. at 21-23.) Blessing also reviewed Kissinger's pre-employment questionnaire in which she disclosed her conditions to Mennonite Home. (Aug. 3, 2021 Trial Tr. at 18-20; Aug. 4, 2021 Trial Tr. at 40-41; Pl.'s Ex. 2 at Mennonite000188.) Kissinger later discussed her anxiety and depression with Blessing during several one-on-one meetings when Blessing served as her supervisor in 2017. (Aug. 3, 2021 Trial Tr. at 40-41.) Specifically, in March 2017, Kissinger informed Blessing of changes to her medication when they were discussing Kissinger's recent breakdowns, bouts of crying, and difficulty focusing on projects at work. (*Id.*) Kissinger asked Blessing if she could ask her father, a pharmacist, about her medication and whether the recent changes could be adversely affecting Kissinger. (*Id.*) The following week, Blessing told Kissinger that her father indicated that Kissinger had undergone "a lot of med changes at one time." (*Id.* at 42.)

Other Mennonite Home employees shared their concerns about Kissinger with Blessing. For example, Mason communicated every day with Blessing, with whom she had a close, friendly relationship, including having "many discussions" about Kissinger's depression. (*Id.* at 194, 197-98, 210.) In 2017, prior to Kissinger's termination, Mason and Blessing specifically discussed Kissinger's depression and its effect on her job performance. (*Id.* at 195-96.) Blessing told Mason that she believed that Kissinger was heavily medicated and that she intended to ask her father about Kissinger's medication.[2] (*Id.* at 196-97.) Daye also asked Blessing "on a couple of occasions … what could be done to help [Kissinger] out because of her being so upset and crying and overwhelmed." (Aug. 4, 2021 Trial Tr. at 8.) Moreover, in the summer of 2017, Iuliano expressed concern to Blessing about there being "a lot going on" with Kissinger and that she had lost a lot of weight. (*Id.* at 139-140.)

### D.      Kissinger's Leave and Termination

In June 2017, Kissinger's anxiety and depression reached an apex. Her sons Mason and Kyle Kissinger had moved back into her home, along with her two-year-old grandson. (Aug. 3, 2021 Trial Tr. at 52, 217-18.) Kissinger and her boyfriend had also broken up and he had moved his belongings out of her home. (*Id.*) Meanwhile, Kissinger was dealing with several challenges at work, including leading the renovations of Mennonite Home's dining rooms while being short-staffed. (*Id.* at 25, 57.)

Kissinger called Blessing on June 5, 2017 and told her that she "needed some time off" given that "there [were] a lot of things going on," but she "wasn't sure exactly what to do." (*Id.* at

---

[2] Blessing denied that she ever spoke to her father about Kissinger's medication. (Aug. 4, 2021 Trial Tr. at 103-04.) However, the Court finds Blessing's denial non-credible, since both Kissinger and Mason testified about having conversations with Blessing regarding this very topic.

51.) Blessing told Kissinger that she would place her on a personal leave. (*Id.*) Kissinger did not go to work on June 5, 6, or 7. (*Id.* at 52.)

On June 8, 2017 at 9:30 a.m., Sauder and Blessing held a meeting with Kham and his brother Derek, another Mennonite Home employee. (*Id.* at 153, 170; Aug. 4, 2021 Trial Tr. at 43.) Sauder and Blessing testified that the Kham brothers said that they observed a lack of leadership and communication in the dining services department, and that they were unable to find supervisors when they had questions, including Kissinger. (Aug. 3, 2021 Trial Tr. at 174-75; Aug. 4, 2021 Trial Tr. at 84-85.) By contrast, Anthony Kham testified that the purpose of the June 8 meeting was to discuss the shortcomings of other members of the dining services department, specifically Daye, and that he did not voice any complaints about being unable to find Kissinger. (*Id.* at 111-12.) He did, however, tell Sauder and Blessing that he did not understand how Kissinger "does not notice [the issues facing the department] going on." (*Id.*)

At 11:20 a.m. on June 8, Kissinger emailed Blessing and Sauder. The subject line was "Confidential." (Joint Ex. 8.) Kissinger wrote:

> Andy moved out a few weeks ago.
> Mason moved back in, the following week.
> Kyle's girlfriend left him and the baby this week. Needless to say they are back here too. The baby is currently unhappy with everyone but me when daddy is not here.
> As I've said before I'm all for leaving it checked at the door but between all [of] this and with the work load, I'm slightly overwhelmed. (Just a bit)  please advise the best thing to do. I don't think it should last pas[t] this week. I don't know if PTO would suffice for this week or if [I] should be looking at something else. Personal leave, [intermittent] FMLA?? PLEASE advise what's best…
> Please help.

(*Id.*)

Kissinger testified that she proposed taking FMLA leave in her email because "I no longer could concentrate or focus . . . I was pleading to them to help me in the best direction as they were well aware of what was going on in my life." (Aug. 3, 2021 Trial Tr. at 53.)

After receiving the email, Blessing called Kissinger and told her that she would extend her personal leave for an "undetermined" amount of time. [3] (*Id.* at 53, 223-25; Aug. 4, 2021 Trial Tr. at 11, 77.) Blessing told Kissinger "not to worry," to keep in touch, and that they could discuss a date for Kissinger's return to work at a later time. (Aug. 3, 2021 Trial Tr. at 53; Aug. 4, 2021 Trial Tr. at 79.) Blessing also asked about Kissinger's ongoing EAP sessions. (Aug. 4, 2021 Trial Tr. at 79.) Kissinger said that they were going well but that she would be unable to afford them after her third session. (*Id.*) At 12:01 p.m., Blessing emailed Kissinger with contact information for Mennonite Home's EAP provider and signed off with "[l]et me know how else I can help you." (Aug. 3, 2021 Trial Tr. at 54; Joint Ex. 8.)

During her leave, Kissinger continued to attend EAP sessions and "tr[ied] to get [her] emotional and mental state under control." (Aug. 3, 2021 Trial Tr. at 56.) Blessing spoke with Kissinger at least once to ask about Kissinger's progress with her EAP sessions. (Aug. 4, 2021 Trial Tr. at 64.)

At dining services departmental staff meetings during Kissinger's leave, which were also attended by Blessing and Sauder, Daye and Kham could not recall any complaints being made

---

[3] Although Kissinger testified that Blessing told Kissinger that she was placing her on an extended personal leave, and Sauder testified that it was his understanding that Kissinger was placed on personal leave, Kissinger was in fact using her accumulated paid time off ("PTO") during June and July 2017. (*See* Aug. 3, 2021 Trial Tr. 51, 53, 172, 221.) Kissinger did not know this at the time. (*Id.* at 221.) The Court finds that Blessing's testimony that she told Kissinger that she would be using PTO, and not going on personal leave, is non-credible because it is contradicted by both Kissinger's and Sauder's testimony. (Aug. 4, 2021 Trial Tr. at 79.) In any event, whether an employee takes PTO or goes on personal leave has no bearing on her ability to qualify for FMLA leave.

about Kissinger. (*Id.* at 12, 112.) Mason and Blessing also continued to discuss Kissinger's depression one-on-one, including whether Kissinger "will be okay" and "be able to come back and do her job." (Aug. 3, 2021 Trial Tr. at 197.) According to Mason, Blessing and Mason spoke about Kissinger's depression "the most" after Kissinger went on leave. (*Id.* at 197-98.)

Kissinger returned to Mennonite Home on July 18, 2017. (*Id.* at 57; Joint Ex. 14.) Upon her return, Blessing and Mortensen, her new supervisor, placed her on a Performance Improvement Plan ("PIP"). (Joint Ex. 17.) The PIP was proposed and drafted by Blessing, edited by Mortensen, and further reviewed and approved by Sauder. (Aug. 3, 2021 Trial Tr. at 58, 173; Aug. 4, 2021 Trial Tr. at 211; Joint Exs. 16, 17, 24.) Sauder and Blessing testified that they placed Kissinger on the PIP based on complaints stemming from their June 8 meeting with the Kham brothers. (Aug. 3, 2021 Trial Tr. at 175; Aug. 4, 2021 Trial Tr. at 84-85.) Mortensen relied on Blessing's recommendation and followed her lead in placing Kissinger on her PIP since he and Kissinger had never worked together prior to that time. (Aug. 4, 2021 Trial Tr. at 210-11.)

Kissinger's PIP required, among other things, that she: "continue with EAP as advised by [her] therapist," the records of which would be received by Mennonite Home's HR department; work at Mennonite Home from 8:00 a.m. through 4:30 p.m. each workday; and receive Mortensen's approval for any changes to her schedule. (Aug. 3, 2021 Trial Tr. at 58-59; Joint Ex. 17.) It also included multiple provisions regarding Kissinger's management of her supervisees. (Joint Ex. 17.)

On July 24, 2017, Kissinger visited Dr. Mueller. (Aug. 3, 2021 Trial Tr. at 60, 234; Joint Ex. 1 at Kissinger000389-94.) Dr. Mueller changed Kissinger's medication during this appointment, starting her on Wellbutrin and Zoloft and stopping her Cymbalta. (Aug. 3, 2021 Trial Tr. at 60-61; Aug. 4, 2021 Trial Tr. at 158-59; Joint Ex. 1 at Kissinger000391-92, 400.) Dr. Mueller

testified that these changes to Kissinger's medication brought with them the "risk you run when you aggressively treat someone[,] that they might not quite adjust to it." (Aug. 4, 2021 Trial Tr. at 161.) He recorded her weight as 111 pounds and reported her mood as "anxious, depressed, and excessive crying." (*Id.* at 162.) He further noted that Kissinger's "depression [] is worsening and anxiety [] is worsening" due to "be[ing] overwhelmed at work" and having "her older son move back in," with symptoms including "difficulty concentrating, difficulty functioning at work, insomnia and anhedonia." (Joint Ex. 1 at Kissinger000393.)

During this time, Kissinger continued to work with no complaints from Blessing, Mortensen, or Sauder. (Aug. 3, 2021 Trial Tr. at 61.) She even occasionally worked extra hours beyond the schedule outlined in her PIP. (*Id.*) On July 28, 2017, Kissinger stayed at Mennonite Home until 6:00 p.m. or 7:00 p.m. with a representative from Gordon Food Services, with whom Kissinger was working to upgrade Mennonite Home's dining services software. (*Id.* at 62-63.) Kissinger and the representative arranged a subsequent meeting for the evening of Monday, July 31, in part due to Kissinger's office furniture being replaced that morning. (*Id.* at 63.) Blessing and Daye had scheduled the furniture replacement for the morning of July 31 while Kissinger was still on leave. (*Id.* at 63, 232; Aug. 4, 2021 Trial Tr. at 8.)

Kissinger arrived at work at 10:00 a.m. on July 31 after her furniture had been replaced. (Aug. 3, 2021 Trial Tr. at 64-65; Aug. 4, 2021 Trial Tr. at 217.) After she arrived, Mortensen told Kissinger that he had noticed that she was not there at 8:00 a.m., and Kissinger apologized to him. (Aug. 3, 2021 Trial Tr. at 64-66.) Kissinger later emailed Mortensen asking to flex her schedule to accommodate future evening meetings with the Gordon Food Services representative. (Joint Ex. 20 at Kissinger000493.) Mortensen replied that "[i]t is critical that you improve your communication, especially knowing that I have an expectation we connect each morning." (*Id.* at

Kissinger000492.) He instructed Kissinger to "let me know ahead of time when there is a change to your work schedule" and "[i]f there is an emergency . . . it would be my expectation that you would alert me as soon as it is reasonable and safe to do so" via "message (work or cell) or email[]." (*Id.* at Kissinger000492-93.) Kissinger again apologized. (*Id.* at Kissinger000492.) She let Mortensen know that "I thought somewhere along the way everyone was aware what was going on with [the furniture removal]. (Besides me)." (*Id.*) Blessing was copied on each of these communications. (*See* Joint Ex. 21.) Mortensen approved Kissinger's schedule change, and her hours shifted to a later start and end time. (Aug. 3, 2021 Trial Tr. at 67; Aug. 4, 2021 Trial Tr. at 227-28.) Also on July 31, Mortensen sent Kissinger a handwritten card praising her for "[a]nother successful week at Mennonite Home" and her "dedication to this process," and letting Kissinger know that he was "rooting for [her]" and was "confident that [she's] going to make it. [She] already [is]!" (Aug. 3, 2021 Trial Tr. at 68; Joint Ex. 22.)

At no point did Mortensen, Blessing, or anyone from Mennonite Home inform Kissinger that her 10:00 a.m. arrival on July 31 constituted a "no call/no show" violation. (Aug. 3, 2021 Trial Tr. at 68-69; Aug. 4, 2021 Trial Tr. at 220.) Kissinger ultimately worked nine-and-a-half hours on July 31. (Aug. 3, 2021 Trial Tr. at 68.)

Two days later, on August 2, 2017, Kissinger overslept and missed a 9:30 a.m. senior leadership meeting that she was required to attend. (*Id.* at 69-70, 179; Aug. 4, 2021 Trial Tr. at 93.) Kissinger awoke around 10:00 a.m. disoriented, unable to focus, "in a daze," "very confused," and in a "very deep fog." (Aug. 3, 2021 Trial Tr. at 69.) Kissinger attributed her state to side effects from the recent changes to her medication. (*Id.*)

At 10:04 a.m., Kissinger called Blessing; she did not pick up, so she left her a voicemail message. (*Id.* at 69-70; Aug. 4, 2021 Trial Tr. at 67.) Although she could not recall the exact

contents of this voicemail message, Kissinger testified that she told Blessing about the issues with her medication.[4] (Aug. 3, 2021 Trial Tr. at 70.) Kissinger then called Mortensen at 10:05 a.m. and left him a voicemail message when he did not pick up, saying, "I'm not going to be in today. And if—I left a message for [Blessing] also, so give me a call back or I'll talk to you tomorrow." (*Id.* at 72.) Neither Blessing nor Mortensen returned Kissinger's call. (*Id.* at 73.)

Following the senior leadership meeting, Blessing, Mortensen, and Sauder met and decided to terminate Kissinger. (*Id.* at 177-78; Aug. 4, 2021 Trial Tr. at 214.) When making the decision to terminate her, the trio did not discuss Kissinger's mental state, anxiety, or depression. (Aug. 3, 2021 Trial Tr. at 182.)

Kissinger returned to work the following day, August 3, 2017. (Aug. 3, 2021 Trial Tr. at 73.) Blessing and Mortensen were waiting for her as she entered the building. (*Id.*) They immediately called her into Mortensen's office and terminated her. (*Id.*) During this meeting, Blessing read aloud Kissinger's termination report, which provided the following justification for her termination:

> [Kissinger] did not report to work at 8:00am on 7/31/17 and did not call her supervisor to say she was going to be coming in at 10:00am instead of 8:00am. On 8/2/17 [Kissinger] did not report to work at 9:30am (9:30am time was approved by her supervisor) and did not call her supervisor until 10:00am to say she was not going to be in that day. Both occurrences are considered no call/no shows under Mennonite Home Community policy 211 Absenteeism/Call-Ins. Both occurrences are also in violation of the Improvement Plan that was issued and signed by [Kissinger] on 7/25/17.

---

[4] Blessing unsurprisingly disputes that Kissinger told her about her medication in the voicemail message. It should be noted that the voicemail message Kissinger left for Blessing was not entered into evidence because neither Blessing nor Mennonite Home's IT department was able to recover the voicemail message—not the only piece of key evidence Blessing was unable to produce, as she also could not recover notes she took during the June 8 meeting with the Kham brothers— calling into doubt Blessing's competing recollection. (Aug. 4, 2021 Trial Tr. at 44, 67-68, 91.) Blessing's credibility is further diminished by Mason's contrary testimony that, after receiving the voicemail message on August 2, Blessing told her that Kissinger was "on strong medication and [] had overslept." (Aug. 3, 2021 Trial Tr. at 208.)

(Joint Ex. 23.)

Kissinger then handwrote on the document, in front of Blessing and Mortensen, that "I was changed on medication + had a side effect from it on 8-2-17 when I called to notify." (*Id.*; Aug. 3, 2021 Trial Tr. at 74-75.) Blessing testified that the sole reason Kissinger was terminated was because of her violations of Mennonite Home's "no call/no show" policy. (Aug. 4, 2021 Trial Tr. at 68.) Blessing neither engaged in an FMLA assessment nor provided Kissinger with notice of her rights under the FMLA at any time. (*Id.* at 53-54, 64-65.)

### E.    Post-Termination

Kissinger filed for unemployment compensation following her termination. (Aug. 3, 2021 Trial Tr. at 76.) She was unable to find employment in the months immediately following her termination, whether it was "something comparable" or "a serving position or whichever just to bring some type of money in." (*Id.* at 79.) Through August and September 2017, she searched for jobs using platforms such as CareerLink, Indeed, Glassdoor, ZipRecruiter, and LinkedIn. (*Id.* at 76-77, 244-45, 248.) She also looked at job boards for certified dietary managers, as well as postings made by LeadingAge PA, a Pennsylvania trade association for non-profit retirement homes. (*Id.* at 248-49.) She found that she was not eligible for several of the posted jobs because she did not have a Bachelor's or Associate's Degree. (*Id.* at 249.) Kissinger testified that she "was a wreck" and "going through a mental breakdown" post-termination. (*Id.* at 77.) She continued to visit Dr. Mueller during this time. (*Id.* at 77-78.)

In November 2017, Mason Kissinger was involved in a near-fatal car accident, after which he was in a coma for four days. (*Id.* at 79-80.) Mason Kissinger's injuries required him to undergo daily physical, speech, and occupational therapy through the spring of 2018. (*Id.* at 80-81.)

16

Kissinger drove her son to his appointments, since he could not drive himself, further limiting her ability to find work. (*Id.*)

After her unemployment compensation ran its course, Kissinger cashed in her 401(k) account. (*Id.* at 85-86.) Kissinger lived off the proceeds of her 401(k) account until she was hired by Penn Manor School District as its Cafeteria Manager in May 2019, where she currently works. (*Id.* at 83, 95-96.) Kissinger makes a salary of $15.39 per hour and is guaranteed 7.5 working hours per day over the 180-day school year. (*Id.* at 83-84.)

In June 2019, Kissinger foreclosed on her home and was homeless for three months. (*Id.* at 87-88.) She continued to search for work. (*Id.* at 95.) In June 2021, she was hired by Costco, a big-box retailer, where she works during the summer when school is not in session. (*Id.* at 96.)

Kissinger testified that, after eighteen years at Mennonite Home, she "would have stayed there forever" had she not been terminated. (*Id.* at 96.) Kissinger, however, expressed hesitation about returning if she had the opportunity to do so because she "would want to believe in the company that I work for, and I guess I could say Mennonite Home left a bad taste in my mouth." (*Id.* at 97.) To this day, Kissinger continues to receive treatment for her anxiety and depression from Dr. Mueller. (*Id.* at 96.)

## II.   CONCLUSIONS OF LAW

### A.   FMLA Claims

#### 1.   FMLA Interference

Count IV of Kissinger's Complaint asserts an FMLA interference claim against Mennonite Home. The FMLA prohibits employers from "interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the" FMLA. 29 C.F.R. § 825.220(a)(1). To prevail on an FMLA interference claim, Kissinger must show that she was entitled to benefits

under the FMLA and that she was denied them. *Sommer v. Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006). Specifically, Kissinger must establish that: (1) she was an eligible employee under the FMLA; (2) Mennonite Home was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice of her intention to take FMLA leave to Mennonite Home; and (5) she was denied benefits to which she was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

Here, the parties do not dispute that Kissinger was an "eligible employee" under the FMLA or that Mennonite Home is an "employer" subject to the Act. The parties dispute, however, whether Kissinger was entitled to FMLA leave and whether she provided Mennonite Home with sufficient notice of her intention to take FMLA leave. As explained below, the Court finds for Kissinger on both of these issues, and also finds that Mennonite Home denied Kissinger benefits to which she was entitled under the FMLA. Kissinger has thus successfully established that Mennonite Home interfered with Kissinger's rights under the FMLA.

a.  Entitlement to FMLA Leave

An employee is entitled to FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). FMLA regulations provide that a "serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves . . . continuing treatment by a health care provider . . ." 29 C.F.R. § 825.113(a). Chronic conditions—which are conditions that "[r]equire[] periodic visits (defined as at least twice a year) for treatment by a health care provider . . . ; [c]ontinue[] over an extended period of time (including recurring episodes of a single underlying condition); and . . . [m]ay cause episodic rather than a continuing period of incapacity . . ."—are serious health conditions. *Id.* § 825.115(c). "Incapacity"

is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* § 825.113(b).

Here, Kissinger's anxiety and depression are chronic conditions within the meaning of the FMLA: managing Kissinger's anxiety and depression requires periodic, more-than-biannual visits to Dr. Mueller; her visits have been ongoing since she was a teenager; and her depression and anxiety manifest in "episodic" periods of incapacity—or, as Kissinger described it, "some days [] are better than others," even if the conditions are "always there." (Aug. 3, 2021 Trial Tr. at 25. *See generally* Joint Exs. 1, 28.)

Defendants spend much time in their FOF&COL contending that Kissinger's anxiety and depression did not render her "incapacitated." (*See* Defs.' FOF&COL ¶¶ 258-66.) Rather, Defendants pin Kissinger's time away from Mennonite Home on her being "overwhelmed" at work. Curiously, throughout their brief, Defendants repeatedly quote the word "overwhelmed" as used in Kissinger's June 8 email as if it is the smoking gun indication that Kissinger's "inability to work" was not due to her health conditions—and as though being "overwhelmed" and suffering from anxiety and depression are mutually exclusive. In doing so, Defendants show a hard-hearted misunderstanding of what it means to be a person living with anxiety and depression. If quoting "overwhelmed" several times was an attempt to compare Kissinger's situation to one involving the "mere incantation of the word 'stress'" by an employee to "create a federal case," Defendants fall far short. (*Id.* ¶ 261 (citing *Deleva v. Real Est. Mortg. Corp.*, Civ. A. No. 04-1299, 2007 U.S. Dist. Lexis 45136, at *39 (N.D. Ohio June 21, 2007)).)

Instead, the testimony of Kissinger, Mason, Iuliano, Daye, and Kham showed that Kissinger's panic attacks, crying breakdowns, and concentration issues severely impeded her ability to work and perform regular daily activities. (*See, e.g.*, Aug. 3, 2021 Trial Tr. at 139-40

(Iuliano: "JoBeth had always been a good director for me up until a couple of months [ago], you know, the beginning of 2017. Again, any time I would come with an issue or try to work through things, you know, within no time we were crying, and you know, I couldn't get anywhere."); *id.* at 212 (Mason: "I don't think they disliked JoBeth personally, but I think that because of her depression she had probably served her purpose.").) They established that, by the summer of 2017, Kissinger faced serious personal issues at the same time as she was leading several demanding projects at work, compounded by the dark cloud of anxiety and depression looming over her. (*See* Aug. 4, 2021 Trial Tr. at 10 (Daye: during Kissinger's leave, "I went over to her house to go check on her and she was the only one home but there were no lights on in the house except for [the] exhaust fan light []. And she was in her room and she just had a TV on. And the curtains were drawn and she was just cocooned into her covers like just kind of made a nest for herself and was just sitting there crying and just upset and didn't know what to do. . . . She was just going over how stressed she was and how she was going to be able to accomplish everything and how overwhelmed she was with everything going on.").)

Defendants further argue that, even if the Court credits the lay testimony of Kissinger's colleagues, Kissinger did not provide "any medical evidence that her claimed inability to work" was due to her anxiety and depression, as required under *Schaar v. Lehigh Valley Health Servs.*, 598 F.3d 156, 161 (3d Cir. 2010). Mennonite Home's sole citation to the record in support of this contention is that "Dr. Mueller never admitted that he made a determination that Kissinger needed time off work due to her stressors nor did he ever recommend that to her." (Defs.' FOF&COL ¶ 262.) But this ignores Dr. Mueller's extensive testimony regarding Kissinger's anxiety and depression, particularly through 2017. During this time, he observed her conditions manifesting in the form of several severe symptoms, including at work, and changed her medication multiple

times due to its ineffectiveness in treating her. (Aug. 4, 2021 Trial Tr. at 147-162, 166; Joint Ex. 1 at Kissinger000383; *see also generally* Joint Ex. 1.) The Court finds that through this "combination" of medical and lay testimony, Kissinger has satisfied her burden of demonstrating that she experienced serious health conditions that rendered her incapacitated within the meaning of the FMLA. *Schaar*, 598 F.3d at 161. She was thus entitled to FMLA leave.

b. <u>Notice</u>

"To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 303 (3d Cir. 2012). The employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). If the need for leave is unforeseeable, the employee must only "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.*; *see also Lichtenstein*, 691 F.3d at 303 ("Reasonableness does not require certainty, and 'may' does not mean 'must.'"). As the Third Circuit has previously noted, this "is not a formalistic or stringent standard." *Lichtenstein*, 691 F.3d at 303; *see also Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007). Accordingly, the critical test is not whether the employee provided her employer with every necessary detail for the employer to verify that the FMLA actually applies, but, instead, "how the information conveyed to the employer is reasonably interpreted." *Sarnowski*, 510 F.3d at 402. "[W]here the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying." 29 C.F.R. § 825.303(a). The burden is on the employer to request this additional information. *Lichtenstein*, 691 F.3d at 305.

When discussing this element, Defendants' FOF&COL focuses heavily on the content of Kissinger's June 8, 2017 email, arguing that it was insufficient to put Mennonite Home on notice because it "never mentioned any existing medical treatment, any contemplated medical treatment, or even a medical condition or concern." (Defs.' FOF&COL ¶ 236.) As Defendants write, "words have meaning and the Court cannot infer something more from Kissinger's notice than what it actually says." (*Id.*) But this ignores well-established law that, compounded with testimony clearly demonstrating that Mennonite Home knew about Kissinger's conditions, put the onus on Mennonite Home to, at minimum, request additional information from Kissinger or perform an assessment about whether she was qualified for FMLA leave. In other words, because *both* actions—such as Kissinger's crying breakdowns and panic attacks at work—and "words have meaning"—such as the words spoken between Blessing and Kissinger during their numerous one-on-one meetings regarding her anxiety and depression, in addition to Kissinger requesting that her supervisors "[p]lease help" her in her June 8 email—Kissinger sufficiently established that Mennonite Home was on notice of Kissinger's conditions and need for FMLA leave.

Both Blessing and Sauder were well aware of Kissinger's need to take leave. Kissinger's June 8 email asked that both Blessing and Sauder "PLEASE advise" and "[p]lease help" Kissinger determine whether "[intermittent] FMLA" leave was an option for her. (Joint Ex. 8.) That is plenty indicial on its own. But if Kissinger explicitly mentioning the FMLA was not enough, Blessing's actions immediately following her receipt of Kissinger's email revealed that she knew about Kissinger's need for time away from Mennonite Home. As soon as she saw the email, Blessing called Kissinger to discuss her taking time off, as well as to ask about her EAP sessions. (Aug. 3, 2021 Trial Tr. at 53; Aug. 4, 2021 Trial Tr. at 79.) Approximately forty minutes later, she sent Kissinger an email containing information to schedule further EAP sessions. (Joint Ex. 8.) Blessing

also knew that Kissinger had attended EAP sessions prior to June 8. (Aug. 4, 2021 Trial Tr. at 45.) As noted in the PIP that Blessing herself drafted, she knew that Kissinger was specifically seeing a mental health therapist and not a counselor to assist with, for example, financial issues as Blessing surmised on the stand. (*See* Joint Ex. 17 ("Continue with EAP as advised by therapist . . ."); Aug. 4, 2021 Trial Tr. at 65.) And although Blessing testified that she believed Kissinger's email indicated that she needed only "a few more days off," she left Kissinger's return to Mennonite Home open-ended, and Kissinger ultimately used roughly six weeks of her accrued PTO. (Aug. 4, 2021 Trial Tr. at 80.)

Beyond Kissinger's email, several witnesses established that Blessing knew of Kissinger's conditions long before June 8, 2017. *See Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 903-04 (8th Cir. 2010) ("By itself, [plaintiff's] request for thirty days' leave to 'take care of things' would be insufficient. . . . However, there are other facts that, taken in their totality, create a material question as to the adequacy of [plaintiff's] notice [including that] there are a number of facts demonstrating [defendant's] awareness of [plaintiff's] mental condition. . . . A jury could consider the effect that [plaintiff's] mental state, and [defendant's] awareness of that state, had on the objective sufficiency of [plaintiff's] notice.") For example, Kissinger credibly testified that she discussed her anxiety, depression, and changes made to her medication with Blessing during several one-on-one meetings when Blessing served as her supervisor. (Aug. 3, 2021 Trial Tr. at 40-41.) Blessing even asked her pharmacist father about the changes to Kissinger's medication and relayed his assessment back to Kissinger. (*Id.* at 41-42.) Mason testified about conversations she had with Blessing about Kissinger's depression before she went on leave: "I consider Kimberly a good friend and I share with her about my own depression, we talked about JoBeth's depression . . . and how I empathize with her because I went through that." (*Id.* at 208.) Daye also testified

that she had discussions with Blessing before Kissinger went on leave and "on a couple occasions asked what could be done to help [Kissinger] out because of her being so upset and crying and overwhelmed." (Aug. 4, 2021 Trial Tr. at 8.)

Thus, by the time Blessing received the June 8 email, Blessing was aware of Kissinger's conditions such that she had sufficient information to reasonably determine whether the FMLA may apply to Kissinger's leave request. At the very least, Blessing was required to inquire further of Kissinger to ascertain whether her leave would have been FMLA-qualifying. She did not.

Sauder also had notice of Kissinger's need for FMLA leave. During trial, Sauder made several questionable denials while on the stand, responding "no" to questioning from Defendants' counsel asking whether he: was aware of Kissinger's anxiety and depression; was aware that she took medication for those conditions; ever had a discussion with Kissinger about anxiety or depression while she was employed at Mennonite Home; or ever saw her crying at work. (Aug. 3, 2021 Trial Tr. at 167-68, 182-83.) But Sauder's terse, one-worded responses do not hold up to the vivid pictures of Kissinger suffering at work painted by the testimony of Kissinger, Daye, Mason, and Iuliano. These incongruities diminish his credibility as a witness.

Sauder also tried at several times to push responsibility for his employees' well-being onto Blessing. Although Blessing, as Vice President of HR, is absolutely responsible for helping Mennonite Home's employees navigate the contours of its leave policies, Sauder, as President (and, of note, the former director of Mennonite Home's HR department), also bears responsibility for ensuring his employees are cared for under his watch. That he could so rashly and quickly set aside Kissinger's obvious plea for help in her June 8 email as merely "acknowledging she has a lot going on" is, frankly, disheartening, particularly after hours of testimony from Kissinger in which it was established that she and Sauder were not only coworkers, but friends. (*Id.* at 185.)

24

Sauder's awareness of Kissinger's health conditions strongly supports Mennonite Home being on notice of Kissinger's need to take FMLA leave.

Kissinger has thus successfully established the "notice" element of a claim for FMLA interference.

c.  <u>Denial of FMLA Benefits</u>

The Court also finds that Kissinger was denied FMLA benefits to which she was entitled. Blessing testified repeatedly that at no point did she inform Kissinger of any of her rights under the FMLA or engage in an FMLA leave assessment. (Aug. 4, 2021 Trial Tr. at 53-54, 64-65.) Defendants' assertion in their FOF&COL that "[b]ased upon the information provided, Blessing determined that FMLA leave did not apply" is contradicted by Blessing's own testimony that she never engaged in an FMLA analysis in the first place. (Defs.' FOF&COL ¶ 241; Aug. 4, 2021 Trial Tr. at 54, 64-65.) Moreover, even if Blessing were to have determined that the FMLA did not apply, either she or someone else from HR was required to tell Kissinger why she did not qualify. (Aug. 4, 2021 Trial Tr. at 52.) Nobody ever did so.

Further, according to Blessing's own testimony, Kissinger clearly warranted an FMLA assessment. Blessing testified that an employee reporting that they were stressed and that they were unable to come into work because they were stressed would trigger an FMLA assessment. (*Id.* at 46.) Kissinger told Blessing that she was "overwhelmed" and was thus unable to come into work, and yet she was not assessed. Blessing testified that an employee reporting that they had anxiety and depression and needed treatment would also trigger an FMLA assessment. (*Id.* at 46-47.) Blessing knew of Kissinger's health conditions and the fact that she was being treated for them, and also referred her to further EAP sessions, and yet she was not assessed. Blessing testified that an employee in need of EAP services being absent from work for three days or longer would

25

also trigger an FMLA assessment. (*Id.* at 50.) Kissinger attended EAP sessions prior to being absent from Mennonite Home for approximately six weeks, and yet she was not assessed. And Blessing testified that an employee returning to work following a leave of absence in need of or seeking EAP services would also trigger an FMLA assessment. (*Id.* at 50-51.) Kissinger was required to attend EAP sessions by Blessing herself after she returned to work, and yet she was not assessed.

Kissinger was thus denied benefits to which she was entitled. The Court therefore finds that Mennonite Home interfered with Kissinger's rights under the FMLA.

### d.   "Willful" Violation

The Court also finds that Mennonite Home willfully interfered with Kissinger's rights under the FMLA. "To successfully allege a willful violation of the FMLA, the plaintiff must show that the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Caucci v. Prison Health Servs.*, 153 F. Supp. 2d 605, 609 (E.D. Pa. 2001) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). Here, at the time she opted not to assess Kissinger for FMLA leave, Blessing had at least sixteen years of HR experience, including considerable training on the FMLA. (Aug. 4, 2021 Trial Tr. at 39.) Additionally, as Sauder and Mortensen both testified repeatedly, they and other directors regularly relied on Blessing to determine whether employees qualified for FMLA leave and deferred all cases to her and the HR department she headed. (*See* Aug. 3, 2021 Trial Tr. at 156, 169; Aug. 4, 2021 Trial Tr. at 209.) With this experience, coupled with her knowledge of Kissinger's health conditions, Blessing nevertheless denied Kissinger her rights under the FMLA, and thus exhibited a reckless disregard in determining that her—and, by extension, Mennonite Home's—actions were lawful. *See, e.g.*, *Riddle v. Citigroup*, 449 F. App'x 66, 70 (2d Cir. 2011) (determining that

allegations that defendants' HR personnel prevented plaintiff from filling out FMLA leave applications and obtaining leave plausibly suggested that defendants acted with reckless disregard for whether their conduct was prohibited by the FMLA); *Schofield v. Maverik Country Store*, 26 F. Supp. 3d 1147, 1158 (D. Utah 2014) (determining that a reasonable jury could find that defendant showed reckless disregard for whether its conduct was prohibited by the FMLA when it knew of plaintiff's condition and was trained in the FMLA, but did not inquire further of plaintiff when she requested leave). Mennonite Home therefore willfully violated the FMLA.

### 2. *FMLA Retaliation*

Kissinger's Complaint also asserts FMLA retaliation claims against Mennonite Home (Count III), Blessing (Counts I and VI), and Mortensen (Counts II and V). The FMLA prohibits employers from "discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Kissinger's FMLA retaliation claims are reviewed under the familiar *McDonnell Douglas* burden-shifting framework. *Lichtenstein*, 691 F.3d at 302; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). To prevail, Kissinger must first establish a prima facie case of retaliation by showing that: (1) she invoked her right to FMLA-qualifying leave; (2) she suffered an adverse employment decision; and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein*, 691 F.3d at 301-02. If she can do so, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for Kissinger's termination. *Id.* at 302. If Defendants can do so, the burden shifts back to Kissinger to offer evidence that the proffered justification is mere pretext. *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Although Kissinger has established the first two elements of a prima facie retaliation case, she has failed to establish that her termination was causally related to her attempt to exercise FMLA leave. Thus, her FMLA retaliation claims must fail.

     a.  <u>Causation</u>

To demonstrate causation, an employee must point to evidence sufficient to create an inference that a causative link exists between the invocation of her FMLA leave and her termination. *Id.* at 307. Courts generally look to "two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

First, "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003). However, the "mere passage of time is not legally conclusive proof against retaliation." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). To suffice as proof, the interim period should be "so short as to be unusually suggestive of retaliatory motive." *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 705 (W.D. Pa. 2014) (citing *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). The relevant date for determining proximity is the date on which the employee invoked the protections of the FMLA; an employee invokes the protections of the FMLA when she requests FMLA leave. *Hernandez v. Temple Univ. Hosp.*, Civ. A. No. 17-4381, 2019 WL 130508, at *8 (E.D. Pa. Jan. 8, 2019) (citing *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014)). While causation analyses are highly fact-specific, courts in the Third Circuit have consistently held that an interim period of "greater than ten days" is not unusually suggestive on its own and "requires supplementary evidence of retaliatory motive."

*Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014); *see also LeBoon*, 503 F.3d at 233 (period of three months not unusually suggestive on its own); *Dudhi v. Temple Health Oaks Lung Ctr.*, Civ. A. No. 18-3514, 2019 WL 426145, at *8 (E.D. Pa. Feb. 4, 2019) (period of two months not unusually suggestive on its own); *Hernandez*, 2019 WL 130508, at *8 (period of six weeks not usually suggestive on its own); *Allen v. Nutrisystem, Inc.*, Civ. A. No. 11-4107, 2013 WL 1776440, at *6 (E.D. Pa. Apr. 25, 2013) *aff'd*, 546 F. App'x 98 (3d Cir. 2013) (period of one month not unusually suggestive on its own); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (period of three weeks not usually suggestive on its own); *Dajti v. Penn Cmty. Bank*, Civ. A. No. 20-1483, 2021 WL 1209835, at *6 (E.D. Pa. Mar. 31, 2021) (period of two weeks not usually suggestive on its own); *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) ("[S]ix days is at the long end of what has been held to be unusually suggestive.").

Here, Kissinger invoked the protections of the FMLA on June 8, 2017, when she emailed Blessing asking for help in determining whether "[intermittent] FMLA" leave was an option for her. (Joint Ex. 8.) Kissinger was terminated on August 3, 2017. This approximately eight-week period is not unusually suggestive of retaliatory motive.

Additionally, the Court may infer causation where an employer engages in a pattern of antagonism between the time an employee engaged in the protected activity and the adverse employment action. *Abramson*, 260 F.3d at 288. Courts in this Circuit have found patterns of antagonism where an employee is subject to a "constant barrage of written and verbal warnings" and "disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until [her] discharge," as well as where an employee is subject to "repeated violations for trivial matters and unusually close supervision" following the protected activity. *Wells v. Retinovitreous Assocs.*, Civ. A. No. 15-5675, 2016 WL 3405457, at *3 (E.D. Pa. June 21,

2016), *aff'd*, 702 F. App'x 33 (3d Cir. 2017) (internal citations omitted). "A pattern of antagonism, however, is more than a series of disciplinary actions." *Id.* Critically, an employee must also "offer [a] basis for linking the disciplinary actions to her [protected activity]." *Barton v. MHM Correctional Servs.*, 454 F. App'x 74, 79 (3d Cir. 2011) (citing *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 896 (3d Cir. 1993)).

Here, Kissinger has not established a pattern of antagonism on the part of Mennonite Home, Blessing, or Mortensen. Neither Kissinger nor Defendants address causation clearly in their post-trial papers; the closest Kissinger comes to doing so is by citing a series of cases regarding the use of PIPs as evidence of retaliatory intent. However, even if the Court were to construe these citations as support for the argument that Kissinger's PIP represents an antagonistic action on the part of Defendants, PIPs by themselves are not sufficient to demonstrate a pattern of antagonism. *See Cashman v. CNA Fin. Corp.*, Civ. A. No. 08-5102, 2012 WL 113667, at *10 (E.D. Pa. Jan. 13, 2012). And although Kissinger avers that the PIP contained "arbitrary provisions that did not meet the needs of the job," the PIP primarily contained provisions related to Kissinger's supervision of others in the dining services department—in connection with the Kham brothers' comments at the June 8 meeting about Kissinger's lack of awareness of the happenings in the department—as well as a provision requiring that Kissinger continue with her EAP sessions, which she acknowledged were constructive and helpful for her. (Pl.'s FOF&COL ¶ 237; Aug. 4, 2021 Trial Tr. at 88-89, 111-12; Joint Ex. 17.) Moreover, Kissinger was admittedly overburdened with work before she went on leave, and the PIP contained provisions meant to ensure that the projects she was juggling were completed. (*See* Joint Ex. 1 at Kissinger000393 ("has been overwhelmed at work"), 402 ("challenging job"); Aug. 3, 2021 Trial Tr. at 25, 53, 57.)

The Court further finds that Kissinger did not face antagonistic behavior on the part of her coworkers after she returned to Mennonite Home from leave. Indeed, after Kissinger arrived late on the morning of July 31, Mortensen worked with her to adjust her hours. He even sent Kissinger a handwritten card that same day letting her know that he was "rooting for [her]" and was "confident that [she's] going to make it. [She] already [is]!" (Joint Ex. 22.) The parties submitted into evidence emails among Mortensen, Kissinger, and Blessing discussing her late arrival on July 31, but these emails (and all other emails in evidence) are not mean-spirited and contain no reference or inference regarding Kissinger's invocation of the FMLA or her health conditions. Defendants should have been clearer with Kissinger at the time that her July 31 lateness constituted a "no call/no show" violation—as Mortensen admitted on the stand—but it was nevertheless established at trial that Mennonite Home has a flexible disciplinary policy, and it was thus not out of turn for the Handbook's policies not to be enforced to a tee. (Aug. 4, 2021 Trial Tr. at 220-21.) Moreover, Kissinger's conditions were not discussed when Blessing, Mortensen, and Sauder made the decision to terminate her. (Aug. 3, 2021 Trial Tr. at 182.)

Nevertheless, Defendants should not interpret this as absolving them from wrongdoing. Indeed, Blessing, Mortensen, and Sauder clearly went about Kissinger's termination unfairly: it was unfair that Kissinger worked nine-and-a-half hours on July 31, faced a legitimate medical issue on August 2, and was nonetheless terminated after eighteen years of service to Mennonite Home on what can best be described as a technicality. Although the Court finds that Defendants' behavior toward Kissinger (and ultimate decision to terminate her) was not antagonistic, it could be characterized as severe at best and unfeeling at worst.

In any event, however, because Kissinger cannot establish a causative link between her request for FMLA leave and her termination, she cannot prevail on her FMLA retaliation claims.

**B.     ADA Claims**

*1.   ADA Discrimination*

Count VII of Kissinger's Complaint asserts an ADA discrimination claim against Mennonite Home. To establish disability discrimination under the ADA, an employee must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by her employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). The third element may be satisfied by establishing that the employer failed to accommodate an employee's disability. *Id.*; *Clemena v. Phila. Coll. of Osteopathic Med.*, Civ. A. No. 17-428, 2017 WL 3453338, at *7 (E.D. Pa. Aug. 11, 2017); *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 776 (E.D. Pa. 2012). This occurs when the employer "does not make reasonable accommodations to the known physical or mental limitations of the employee unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (citing *Taylor*, 184 F.3d at 306) (internal quotation marks omitted); 42 U.S.C. § 12112(b)(5)(A). Because failure to accommodate claims do not require that an employer's action be motivated by a discriminatory animus directed at the disability, the *McDonnell Douglas* burden-shifting framework does not apply. *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 595 (E.D. Pa. 2017). Here, Kissinger has successfully demonstrated that Mennonite Home discriminated against her on the basis of her disability because Mennonite Home failed to accommodate her anxiety and depression when it brushed aside her request for FMLA leave.

a. <u>Disabled</u>

Under the ADA, a person is "disabled" when she has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 43 U.S.C. § 12102(1)(A). Whether an individual is substantially limited in performing a major life activity is a question of fact and an individualized assessment. *Williams*, 380 F.3d at 763; 29 C.F.R. § 1630.2(j)(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1); *Sowell v. Kelly Servs.*, 139 F. Supp. 3d 684, 698-99 (E.D. Pa. 2015).

Defendants do not dispute that Kissinger's anxiety and depression constitute "impairments" within the meaning of the ADA. (Defs.' FOF&COL ¶ 308.) They nevertheless maintain that Kissinger's conditions do not substantially limit any of her major life activities. But courts in this Circuit have consistently found that impairments similar to Kissinger's do. *See, e.g.*, *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 40 (3d Cir. 2018) (anxiety limited plaintiff's sleeping and ability to engage in social interaction); *Albright v. Trustees of Univ. of Pa.*, Civ. A. No 19-00149, 2019 WL 5290541, at *5 (E.D. Pa. Oct. 18, 2019) (anxiety and depression limited plaintiff's sleeping and brain functioning); *Callan v. City of Dover*, 65 F. Supp. 3d 387, 396 (D. Del. 2014) (depression limited plaintiff's thinking, concentrating, sleeping, ability to care for himself, and ability to interact with others); *Est. of Murray v. UHS of Fairmount, Inc.*, Civ. A. No. 10-2561, 2011 WL 5449364, at *6 (E.D. Pa. Nov. 10, 2011) (depression limited plaintiff's thinking, eating, and sleeping).

Here, Kissinger established that her anxiety and depression substantially limit her abilities to sleep and concentrate. Kissinger testified extensively about how her conditions have impacted her ability to focus on and juggle several projects at work, as well as her sleeping habits. (Aug. 3, 2021 Trial Tr. at 25-26, 53.) These limitations were also clearly recorded in Kissinger's 2017 medical records. (*See* Joint Ex. 1 at Kissinger000370 (Dr. Mueller's notes observing Kissinger's difficulty concentrating), 383 (Dr. Mueller's notes observing Kissinger's fatigue and insomnia), 393 (Dr. Mueller's notes observing Kissinger's difficulty concentrating, fatigue, and insomnia), 405 (Kissinger's mood questionnaire noting, *inter alia*, that she experienced sleeping issues and trouble concentrating "[n]early every day"), 410 (Dr. Mueller's notes observing Kissinger's difficulties thinking and sleeping).) The Court therefore finds that Kissinger is disabled within the meaning of the ADA.

### b.  Otherwise Qualified

An employee who is otherwise qualified under the ADA is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). That employee must "satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

There is no serious dispute that Kissinger is otherwise qualified for the purposes of the ADA. Kissinger worked at Mennonite Home for eighteen years and was promoted several times, most recently to a director-level position. (Agreed Facts ¶¶ 9-10.) Kissinger received very positive performance reviews, including praise for being nominated for an industry award, staying within her budget after expanding dining services, and "work[ing] quickly and diligently" to "address

unexpected challenges or changes in plan" in her department. (Pl.'s Ex. 5 at Mennonite000190, 194.) Her supervisors, including Sauder and Mortensen, also acknowledged that Kissinger was successful at her job. (*See* Joint Exs. 3-4, 22.) Indeed, even after she returned from leave, Kissinger was tasked with many demanding and critical projects, including upgrading Mennonite Home's dining services software and completing the dining room renovations. (Aug. 3, 2021 Trial Tr. at 57, 62.) Kissinger is therefore clearly otherwise qualified within the meaning of the ADA.

### c.  Adverse Employment Decision

An employer unlawfully discriminates against an employee where the employee suffers an adverse employment action because of her disability. *Taylor*, 184 F.3d at 306. "Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010); 42 U.S.C. § 12112(b)(5)(A). To request a reasonable accommodation, an employee need not invoke any "magic words"; instead, she "may use plain English and need not mention the ADA or use the phrase 'reasonable accommodation.'" *Taylor*, 184 F.3d at 313 (internal citations and quotation marks omitted). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* A request for FMLA leave, including intermittent FMLA, may qualify as a request for a reasonable accommodation under the ADA. *Capps v. Mondelez Glob. LLC*, 847 F.3d 144, 156-57 (3d Cir. 2017); *Dreibelbis v. Cty. of Berks*, 438 F. Supp. 3d 304, 317 (E.D. Pa. 2020); *Berardinucci v. Temple Univ.*, Civ. A. No. 18-4193, 2020 WL 4201521, at *5 (E.D. Pa. July 22, 2020). Further,

"[a] request for FMLA leave can be considered a request for a reasonable accommodation under the ADA when the employer knows or believes that the request is based on something other than a one-time event." *Berardinucci*, 2020 WL 4201521, at *5 (citing *Beishl v. Cty. of Bucks*, Civ. A. No. 18-2835, 2018 WL 6812132, at *4 (E.D. Pa. Dec. 27, 2018)) (internal quotation marks omitted).

"'Reasonable accommodation' further includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith." *Williams*, 380 F.3d at 761 (quoting *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997)); 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation."). Thus, an employee can demonstrate that her employer breached its duty to provide a reasonable accommodation by failing to participate in this "interactive process." *Williams*, 380 F.3d at 772. To show that an employer failed to participate in the interactive process, the employee must establish that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Taylor*, 184 F.3d at 319-20.

Here, Mennonite Home did not participate in the interactive process, as Blessing herself admitted on the stand. (Aug. 4, 2021 Trial Tr. at 71 (Q: "You never engaged [in any kind of interactive process with Ms. Kissinger]?" A: "No.").) Defendants do not attempt to paint over Blessing's admission in their post-trial papers, but merely argue that, "[b]ecause Kissinger failed to disclose any disability or her need for accommodation, [Mennonite Home's] requirement to engage in the 'interactive process' was never triggered." (Defs.' FOF&COL ¶ 319.) As discussed

extensively above, however, Mennonite Home knew of Kissinger's anxiety and depression. Further, Kissinger requested a reasonable accommodation on June 8, 2017, when she emailed Blessing and Sauder asking them to "[p]lease help" and "PLEASE advise what's best," including potentially "[intermittent] FMLA." (Joint Ex. 8.) Finally, although Mennonite Home never offered evidence on whether an accommodation would place an undue hardship on their business, the fact that Mortensen was willing to modify Kissinger's schedule following her late arrival on July 31, 2017 demonstrated that flexible work hours would not have been difficult to implement whatsoever.

The Court thus finds that Mennonite Home discriminated against Kissinger on the basis of her disability by failing to provide her with a reasonable accommodation as required by the ADA.[5]

### 2. ADA Retaliation

Count VIII of Kissinger's Complaint asserts an ADA retaliation claim against Mennonite Home. To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) she engaged in a protected activity; (2) her employer took an adverse action against her either after or contemporaneous with the employee's protected activity; and (3) there was a causal connection between the employee's protected activity and the employer's adverse action. *Krouse*, 126 F.3d at 500. Kissinger's request for FMLA leave constituted a protected activity, and she was ultimately terminated, which is unquestionably an adverse action.

---

[5] Kissinger also argues that she faced disparate treatment because of her disability. "A claim that an employer failed to accommodate an employee's disability is best viewed not as an independent claim under the ADA, but as a theory that may support a discrimination claim, with disparate treatment representing another possible theory." *Solomon*, 882 F. Supp. 2d at 776. Because Kissinger has already prevailed on her failure to accommodate theory, the Court need not address her disparate treatment theory.

However, as discussed *supra* in relation to her FMLA retaliation claim, Kissinger offered no evidence establishing the requisite causal connection between her request for leave and her termination. "[C]ourts look to the same evidence of causation for an FMLA retaliation case as they do for an ADA retaliation case." *Berardinucci*, 2020 WL 4201521, at *6 (citing *Lichtenstein*, 691 F.3d at 307); *see also Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900-01 (7th Cir. 2018). Therefore, Kissinger's ADA retaliation claim fails.

**C.     PHRA Claims**

Counts IX and X of Kissinger's Complaint assert discrimination and retaliation claims, respectively, against Mennonite Home under the PHRA. The "analysis of an ADA claim applies equally to a PHRA claim." *Taylor*, 184 F.3d at 306 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Therefore, the Court finds that Kissinger has successfully established a PHRA discrimination claim against Mennonite Home. The Court also finds that Kissinger has failed to establish a PHRA retaliation claim against Mennonite Home.

**III.     CONCLUSION**

The Court rules in favor of Kissinger on her FMLA interference, ADA discrimination, and PHRA discrimination claims against Mennonite Home. She has failed to sustain FMLA retaliation claims against Mennonite Home, Blessing, and Mortensen, and ADA retaliation and PHRA retaliation claims against Mennonite Home.

The Court awards Kissinger $296,514.00 in back pay, $296,514.00 in liquidated damages, and $219,008.00 in front pay. The Court finds that Mennonite Home's conduct does not warrant compensatory or punitive damages. The Court further orders that the parties provide the Court with supplemental briefing addressing attorney's fees and prejudgment interest. An Order consistent with this Memorandum will be docketed separately.